FRANK KASTELL

*v.*

FRANK T. HILLMAN and META HILLMAN.

A father promised his son that if the latter would live with and work for him during the father's lifetime, he would devise to him certain lands, and about eighteen months before he died made his will accordingly. Afterwards, and nine days before he died, being very feeble in mind and body, and laboring under a delusion as to his son's conduct, he made a voluntary conveyance of a part of the lands to two of his grandchildren, who were in personal attendance upon him. The son fully performed the conditions of his father's promise.—*Held*, the conveyance must be set aside as against the son.

On final hearing on pleadings and proofs.

*Mr. Thomas M. Moore*, for the complainant.

*Mr. John W. Griggs*, for the defendants.

PITNEY, V. C.

Frank Kastell, the complainant, files this bill against his nephew, Frank T. Hillman, and his niece, Meta Hillman,

4

Kastell *v.* Hillman.

asking the court to set aside a deed of conveyance made by Philip Kastell, the father of the complainant and the grandfather of the two defendants, to the two defendants, dated the 22d of March, 1893. It covers about two acres of land, situate within the corporate limits of the city of Passaic, and on it are the dwelling and outbuildings constituting the homestead of the late Philip Kastell. He died on the 1st of April, 1893, nine days after the execution of the deed. By his will, executed on the 2d of October, 1891, and admitted to probate after bill filed, he had devised this homestead, with other lands, to his son Frank, the complainant herein.

The complainant rests his right to relief on two grounds— *first,* that the premises in question were so devised to him by his father, in pursuance of a contract made between the two many years before, by the terms of which his father agreed to so devise the premises to him in consideration of his living with him, attending to his business and taking care of him during his lifetime, and he alleges that he performed the conditions on his part. The *second* ground is that at the time of the execution of the deed his father had attained the advanced age of about eighty-two years, was very feeble in health, both in mind and body ; that his mind was so far enfeebled as to render him incompetent to transact business of that character, and that the deed was procured from him by undue influence brought to bear upon him in his enfeebled condition by the two defendants, his grandchildren, who were members of his family at that time.

I. With regard to the first point, it seems to me that it is clearly sustained by the proofs. The devise itself is in these words :

"*Third.* I give, devise and bequeath unto my son, Frank Kastell, my farm on which I now reside, situate in said city of Passaic, county and state aforesaid, containing about thirty (30) acres, with all the buildings, granaries, barns, stables and outhouses thereon, together with all the household furniture, farming utensils, tools and other things pertaining to said farm ; also, the horses, cattle, poultry and other live [*sic*] stock, carriages, wagons, harness and everything belonging thereto ; also, about ten (10) acres of salt meadow land, situate and lying in the county of Bergen, in this state.

"*Fourth.* This bequest to my son Frank, I make in consideration of and for his services and assistance rendered to me and my estate by him up to the

Kastell *v.* Hillman.

time of my decease, and is subject to the following charge: My beloved wife, Katherine, shall have as good and comfortable a home on this my said farm as she now has during the remainder of her natural life, and at her death said farm, household furniture &c., &c., &c. and salt meadow lands shall be the property of my son Frank in fee simple."

This clause is of itself evidence of the contract. In addition to that the parol proof is abundant.

Complainant himself swears that when he was a young man (he was forty-two years of age when his father died) he wished to go away from home and strike out in the world for himself— learn a trade or do whatever he might be able to do—and that his father insisted upon his staying there, living with him and helping him on the farm, and promised him if he would do so he would leave him, by will, the lands in question, and that he did so stay, relying upon his father's promise. The same thing is sworn to, in effect, by his sister, Mrs. Anna Fells; also, by Mr. Totten and Mrs. Dankoff, neighbors. Then the division which the old gentleman had made, by will, of his property was well understood by each member of his family. He was a German, who did not attempt to speak English, and understood it very imperfectly.

The lands mentioned in the will were as follows: A little short of ten acres in one body, bisected by Bloomfield avenue, leaving three and a half acres on one side (on which was his dwelling) and a little short of six on the other, the whole located about a mile and a quarter west of the city of Passaic, and beyond the line of the Delaware, Lackawanna and Western Railroad Company. It was within the corporate limits of Passaic, but the neighborhood was not built up or improved. In addition to this ten-acre tract was a tract of thirteen and seven-tenths acres, lying disconnected with and a short distance from it, and not bounding on any highway. It was used for farm land, and as waste sprouts or swamp. Besides this were the ten acres of salt meadow of trifling value. The old gentleman seemed to entertain the notion that the ownership of this land—about thirty-three acres in all—made him a landed proprietor, and as the complainant was his only son, he desired him to reside on it

after his death and perpetuate it in the Kastell name. Besides this property he was the owner of a block about one hundred feet square, situate on a corner, in the city of Passaic proper, upon which were five houses, which were estimated at the value of $25,000, and rented for $200 a month. This last was subject to two mortgages of $1,000 each. He had also some building lots. Besides the complainant, he had two children—daughters— one a Mrs. Anna Fells, who lived with her husband in Lowell, Massachusetts, and the other, who died in her father's lifetime, had married a Mr. Hillman, the father of the defendants, and had borne nine children, of whom the defendants are two. The date of her death, I think, is not given. The block of buildings just mentioned were by the will divided between Mrs. Fells and the Hillman children. Sometime previous to the making of the will above mentioned, but just how long does not appear, the testator had made a will substantially the same as this, except he had excluded from the benefits thereof three of the Hillman children. The contents of this will were known to all his children, and they, particularly Mrs. Fells, feeling that his prejudice against the three Hillman grandchildren was unjust, induced him to change it, and the will of October 2d, 1891, was the result of a family counsel, and was satisfactory to all parties. In point of fact, the value of the two shares given to Mrs. Fells and the Hillman children was greater than that given to the complainant by the will.

The old gentleman had always expressed a desire that his son Frank should have an heir, and in the year 1889, he married a young lady in the neighborhood, whom at first he took to live with his father and mother, but fearing a difference between the mother-in-law and the daughter-in-law, he sent her back temporarily to her father's home, and then proposed to his father to build himself a house on a part of the homestead which had been devised to him, and his father agreed thereto, and in 1890 conveyed him a part of the homestead on the north side of Bloomfield avenue, upon which he erected a house in the summer of that year, and lived there with his wife and attended to his father's business and affairs in the same manner as he had pre-

Kastell *v.* Hillman.

viously done, up to the time of his death. He had also accepted other employment, with his father's consent. He was, among other things, street superintendent of the city of Passaic for four years while living with his father, and swears, and he is uncontradicted therein, that he gave a portion of his salary, or whatever other money he earned outside, to his father. At any rate his performance of the contract must, under the evidence and the language of the will, be held to be satisfactory to the father up to the date of the will. The attention paid by the son to the father from that time on until he died, was precisely the same as it had been previously, and there is no proof that he ever made the least complaint to the complainant or demand upon him to perform anything that he did not perform ; but the tendency of the proofs is to the contrary.

I must then hold, as a matter of fact, that the complainant did perform his part of the contract fully, and that the deceased was under legal obligation to perform his part and to leave undisturbed the devise which he made to him on the 2d of October, 1891.

The wife of Philip Kastell died on the 14th of October, 1891, twelve days after the date of the will, and just before her death, the defendant Meta Hillman, who had been at service in the city of New York, earning wages at $14 a month, came to live with her grandfather and bargained with him to continue to work for him at that price—$14 a month. The defendant Frank T. Hillman was a bricklayer by trade, and at about the same time took board with his grandfather at $4 a week, and worked at his trade in the city of Passaic. In the winter time, when very little masonwork was being done, he did chores about the house, and looked after his grandfather, for his board. That continued up to the time the old gentleman died, with the exception that during the winter of 1892–93 Frank Hillman collected the old gentleman's rents in the city of Passaic. That is, he received them monthly from one of the tenants to whom the others paid.

There is little room to contend that the deed complained of has any valuable consideration. The consideration named is

" one dollar and other good and valuable consideration," and then, at the end of the description, is this clause:

" Part of the consideration of this conveyance is for past services rendered by the parties of the second part, and for future services to be rendered by them to the party of the first part during the remainder of his life, in taking care of him, and also in consideration of natural love and affection which he bears toward them."

There is no doubt about their working for and living with him under a contract, and that he paid his granddaughter for her services in full, either up to Christmas, 1892, or Christmas, 1891, and that he paid her on account as often as she demanded pay, nor is there the least dispute as to what the contract was with the grandson.

Their story is that this deed was suggested to them on the 14th of March, that it was executed on the 22d of March, and he died on the 1st of April. Further, that the old gentleman and the defendants knew at the time that he was very near his end and not expected to live. Hence the deed must be held to be without consideration as against the complainant; and, further, the fact that the complainant was, by a contract with his father and by a family arrangement, to have this property by will from his father, was well known, as before remarked, to all of the members of the family, including the defendants.

The law governing this class of contracts has been frequently considered by this court and is well settled in this state. The latest cases are *Young* v. *Young, 18 Stew. Eq. 27*, where the previous cases are collected (and see the same case on final hearing, *6 Dick. Ch. Rep. 491*), and *Drake* v. *Lanning, 4 Dick. Ch. Rep. 452*.

The contract in this case is sufficiently clear in all its parts. There is no room for dispute as to the land agreed to be devised. The services to be rendered, as in all such cases, are not clearly defined, but they were performed to the satisfaction of the other party through many years and up to the date of his will. Such acceptable and accepted performance removes all difficulty on the score of indefiniteness.

The complainant's claim is a meritorious one.  The case shows that he spent the best part of his life in working for his father and for his father's interest upon this little farm, and with so little profit to himself that when he came to build the house, in 1890, he was obliged to borrow the whole cost of it on mortgage. The land devised to him, including the lot conveyed to him in 1890, and the house and lot here in dispute, do not exceed in value $8,000 or $9,000, while the block in Passaic city, divided between Mrs. Fells and the Hillman children, is worth $25,000, leaving, after deducting the mortgages on it, at least $11,000 for each.  The bargain relied upon was a hard one for the complainant, and its enforcement will give him but scanty justice.

This result is sufficient for the decision of the cause, but as I have fully considered the second ground of relief, and as it throws light upon the first, I will state my conclusions upon it.

II. The evidence as to the mental condition of the deceased, at the date of the execution of the deed in question, is somewhat conflicting.  That he was then very weak in body and mind, as the result of his advanced age and general debility, is thoroughly proved and is indisputable.  This weakness had been coming on with steady increase for several months, and all who saw him perceived that his end was near.  He was himself entirely conscious of this.  A physician was called in for the first time on March 22d, and found his vitality so low that he immediately resorted to electricity.  He was unable to speak German, and communicated with his patient through one of the defendants as interpreter.  He made no examination of his mental condition.

The witnesses mainly relied upon by the complainant to establish incapacity are his sister, Mrs. Fells, and her husband, who reside in Lowell, Massachusetts, and a Mr. Bornecastle, who lived in Passaic, and was tenant of one of the stores, and attended to receiving the monthly payments of rent from the various other tenants of the block and paying it over either to his landlord in person or to the complainant, or, during the last few months, to Frank Hillman.  All three speak German. Mr. and Mrs. Fells visited her father on the 15th of March and

remained until the 18th, Mrs. Fells being with him constantly during that time, and Mr. Fells during the morning and evening hours. They came, upon advice from the Hillmans that he was failing, for the purpose of seeing him and also to assist the Hillmans in a matter of business.

The devise to Mrs. Fells was of two of the five houses and lots in Passaic, one of which was a corner and more valuable on that account. This was subject to a mortgage of $1,000 held by one Somers. The devise to the Hillmans was of the other three houses, which were also subject to a mortgage of $1,000 also held by Somers. The will of October 2d, 1891, was made with the full knowledge of the children and grandchildren, and of their father, Henry Hillman. It was supposed by the children and by Henry Hillman that the encumbrances held by Somers covered only the three houses devised to the Hillmans, and it was understood to be the intention of the old gentleman to sell certain vacant lots which he owned and did not dispose of by his will, and from the proceeds pay off this mortgage. This was never done, and the business object Mr. Fells had in view, in making this visit, was to aid the elder Hillmans in inducing their father-in-law to procure this mortgage to be shifted from the houses devised to the Hillmans and placed upon Frank's share. When he arrived and saw the old gentleman and talked with him, he concluded that he was entirely unfit to do any business and so informed the elder Hillman and the defendant Frank. Mr. Somers came to the house with his mortgages at the request of the Hillmans, but did not see old Mr. Kastell, and the subject of the change was not mentioned to him. Mr. Fells swears that the old gentleman was so weak that he was unable to keep his mind upon one thought for any length of time, that his mind wandered—to use his own language, " I consider that he was gone by from telling right from wrong." He tried to converse with him and to read aloud to him some letters he had received from friends in Germany, tested his mental condition in various ways, with the result above stated. The evidence of Mrs. Fells, who was with her father continuously, is to the same effect. These witnesses are entirely disin-

terested. In fact, their feelings are favorable to the defendants rather than to complainant.

One matter testified to by Mr. Fells I will mention here. He says that the matter of a legacy the old gentleman had recently received from Germany, was mentioned, and he, Mr. Kastell, said that it was $1,450, and that his son Frank, the complainant, had kept $1,000 out of it, and had given him only $450. This idea was erroneous. The legacy was for $450, and Frank kept nothing out of it.

Mr. Bornecastle had several interviews with Mr. Kastell during the three months preceding his death. He was an old and familiar friend, and talked and chatted as such. The effect of his evidence is the same as that of Mr. and Mrs. Fells.

A Mrs. Spreitzer, who saw him about the same time, testifies to the same effect, and says he was *childish.*

As an evidence of failing mental faculties, including judgment about matters of business, complainant relies upon another circumstance. In the summer or fall of 1892, the old gentleman erected a stone foundation for a building on the land immediately in front of his house and across the road. He did this without any settled plan as to what sort of a building should be erected upon it, and he took no measures looking to the erection of any. He told some one that it was for a saloon. The ground was low and wet, and entirely unfit for the purpose, and there was no demand in the neighborhood for any such building. I think the complainant's contention is right in this respect, and that the building of this foundation did indicate a failure of mental power in general and of judgment in particular.

On the other hand, Mr. Weis, the lawyer who prepared and attended to the execution of the deed in question, testified that he took the instructions for it from Mr. Kastell's own lips on the day before it was executed ; that he read and explained it to him carefully before its execution, and that Mr. Kastell was fully conscious of what he did and seemed to understand it. And I think it must be taken as an established fact that Mr. Kastell was conscious of what he did ; that he knew that he was conveying this property to his two grandchildren ; that he desired

so to do, and was satisfied with it. And if such mere wish to do the very thing, and the consciousness that he was doing it, make up the requisite elements of mental capacity, then I think his capacity is established.

But this is not the whole case. Mr. Kastell entertained and expressed a reason for making this conveyance, and I think its validity must depend in a measure upon the question whether that reason was such a one as could be entertained by a sound and healthy mind, or whether it was in itself unreasonable and the result of a weak, childish, morbid and diseased mind.

I have said the ten-acre tract, which formed part of his farm, was bisected by Bloomfield avenue; the cut was somewhat diagonal, so that the pieces were irregular in shape. The part north of Bloomfield avenue contains three and a half acres, and upon it are situate the homestead and the new house erected by complainant in 1890. It was also bisected by a paper street called Union avenue, an extension of one in the city. This street cut it crosswise of Bloomfield avenue, but not at right angles with its lines or at right angles with those of the lot. It was shown upon maps of the city, but had never been run or staked out on the ground where it crossed the ten-acre lot, and neither Frank, the complainant, nor his father, knew just where it crossed. In point of fact, when correctly located, it passed just east of the old gentleman's dwelling, and between it and the barn, covering a part of the latter, and left the lot to its east with a frontage of one hundred and ninety feet, and a width in the rear of two hundred and fifty-one feet, upon which stood nearly the whole of the barn. When, in the spring of 1890, Frank wished to build a dwelling, and to borrow money on mortgage for that purpose, it became necessary for him to have the present title to the lot he built upon, and he asked his father for a deed for the land east of Union avenue, and to this his father agreed, neither one knowing or caring just where the avenue ran, and neither supposing that the proposed lot would include the barn. I say "neither caring," for the will of 1891 was undoubtedly, in substance, a copy of one in existence in 1890, except as to the number of the Hillmans who partook in

their mother's share. Such is, in effect, the evidence of Mrs. Fells, who procured the change to be made and actually brought the lawyer to the house for that purpose. The language of the will of 1891 indicates the same thing, for it does not notice that a part of the homestead had been sold out, but treats it as still wholly the property of the testator; and at the time it was made, the wife of the testator was on her deathbed, not expected to live, and did actually die twelve days later, on October 14th, and yet provision is made for her in this will as if she might live a long time.

This deed of May 8th, 1890, from Mr. Kastell to complainant, was prepared by Mr. George P. Rust, a lawyer of Passaic, who spoke German and knew the parties. The evidence satisfies me that he saw the father twice in respect to it—*first*, to get his instructions for it, and *second*, to witness his execution of it; and further, that the old gentleman was fully aware that he was conveying to Frank all the plot which he owned on the east of Union avenue, wherever that might be, and north of Bloomfield avenue, and that he did this willingly, and that no deception was therein practiced upon him either by Frank, the complainant, or by Mr. Rust. No measurements on the ground were made for the description inserted in the deed. The distances mentioned therein, I am satisfied, were obtained by Mr. Rust by putting a plotter's scale on the city ward map. This conclusion is strengthened by the fact that those distances vary somewhat from those resulting from an actual survey. After this conveyance, no change took place in the occupation and use of the land except that Frank's house was placed upon it very near the east line of the whole tract, and some distance from the barn. No fence was run or mark put up to show the lines.

Some time afterwards, late in August or early in September of either 1891 or 1892, and, for reasons presently stated, I conclude it was in 1891, the old gentleman was digging potatoes near the barn, and Frank objected, on the ground, as he says, that they were too green and immature and would rot when placed in the cellar. The father afterwards said that Frank declared that the potatoes were on his (Frank's) land. This

Kastell *v.* Hillman.

Frank denies and says that nothing of the kind was said, and that there was no feeling whatever manifested towards him personally at any time afterwards by his father on this or any other account. And I stop to say that there is not the least evidence in the case tending to contradict his assertion in that respect. Be that as it may, either the potato incident or something else induced the father to have the calls of complainant's deed measured out on the land, with the result that it was found to include within its calls most, if not all, of the barn, and to be sixty-one feet wider in the rear than in front. This measurement was done with the aid of the Hillmans and entirely without notice to, and in the absence of, the complainant. The result seemed to displease the old gentleman especially, and, I think, only in respect that the increased width in the rear took in the barn, and he mentioned it to the elder Hillman and to Mr. and Mrs. Fells, saying that Frank had cheated him in getting that land. Mr. and Mrs. Fells, as well as Hillman, told him that it made no sort of difference, as by the will it all went to Frank, and they swear that he was satisfied with that, as, indeed, he ought to have been. It is manifest that they did not think that complainant had been guilty of any fraud or deception in the matter, for they never mentioned it to him.

That this discovery was made by the old gentleman previous to the making of the will of October 2d, 1891, appears from the evidence of Meta and Kittie Hillman. Meta swears that she came from New York to live with her grandfather, October 3d, 1891, the next day after the execution of the will, and about eleven days before her grandmother's death, which was October 14th, 1891, and she is quite positive that her grandfather had discovered where the lines of the complainant's deed ran before she arrived. This could hardly be unless he heard it before making the will. Her sister Kittie lived with her uncle Frank, the complainant, the summer of the year after the house was built, viz., 1891, and she heard of it while living there, and this would make it in 1891. It is thus rendered quite clear that the old gentleman knew where the lines of the deed ran before and at the time of the execution of the will.

Now, I think the fact that he executed the will with that. knowledge is strong evidence that at that time he was satisfied with the situation as explained to him by Mr. and Mrs. Fells. At any rate, it is certain that he never spoke to Frank about it, and the fact that he was dissatisfied with it was not known to Frank until at or about the time of his death.

Frank Hillman, the defendant, swears that his grandfather first mentioned the matter of making this conveyance to him and his sister on the 14th of March, 1893, which was Tuesday (the day before his uncle and his aunt, Mr. and Mrs. Fells, came down from Lowell upon notice sent to them by Frank), and he swears that his grandfather said that he wished to make a deed of the homestead house and lot to him and his sister. Then he says that, on the 19th or 20th, after Mrs. Fells had left on the 18th, his grandfather directed him to go and get a German lawyer to come and draw the deed, and that he went and saw his father, Henry Hillman, in Paterson, and on his suggestion procured Mr. Weis to come and attend to the business. Mr. Weis swears that, in a conversation which he had with Mr. Kastell on the occasion of his first visit, when he took instructions for the deed, he endeavored to ascertain the capacity of Mr. Kastell and his reasons for making the proposed conveyance, and that the old gentleman told him that his son Frank had swindled him in the transaction in relation to this property that he had got from him; said Frank asked for a couple of lots to build a house on, and that he got about a couple of acres, and had the deed so drawn that it included a part of the barn. He further stated that Frank had neglected him, had not attended to his wants, and that his grandchildren had done so, and that he wished to make them a compensation.

Henry T. Hillman, the father of the defendants, also had an interview with his father-in-law on the 14th of March, when, as he says, he was specially sent for by the old gentleman, and was told by him that he wished to give a deed for this property to his two children, and at that time the old gentleman repeated to him what he had previously said to him—that Frank Kastell had cheated him in getting the deed for his lot. And it is

entirely clear that that idea, and a supposed lack of attention on the part of the complainant to him, was the cause operating on his mind which procured the conveyance to the defendants. In fact, it was put forward by the defendants as the motive for it.

Mr. Henry Hillman had previously, in connection with Mr. Fells, explained to him that it made no difference how much Frank's deed covered, as it was all willed to him; but he did not repeat that explanation on the 14th of March, and it is remarkable that, while the old gentleman expressed a desire on that day to make that conveyance, nothing was done about it until after the expected visit of the Fells, who were sent for to come to assist to shift the mortgage. When that had failed and the Fells had left, then the project of making the conveyance was revived and the lawyer was sent for.

Now, both of these reasons or motives which produced this conveyance were baseless as a matter of fact. The complainant had not cheated or imposed upon his father in the least in the matter of the conveyance of 1890. He was entirely innocent therein. It is probable that the old gentleman was angered by the manner of his son in the matter of the potatoes, but all that must have been forgiven when the will was made, which was very shortly afterwards. I can attribute its revival in those last days in the virulent form which, according to the defendants, it assumed, to no other than one or both of two causes—either his mind was diseased, as well as weak and childish, and its diseased action recalled this once exploded notion, or it was revived by outside influences. Certain it is that the Hillmans—father and children—were quite ready to take advantage of it, if they did not revive it. But whatever its origin, it was a delusion, and it must be treated as such. So with regard to the notion that his son was neglecting him. It is without any reasonable foundation in fact, and must be attributed to the same source as the other and treated in the same manner.

It follows that the two motives relied upon to sustain this conveyance were either the product of a diseased mind or were imposed upon a weak and childish mind, and the result is the same in either case.

Whether or not the erroneous notion that complainant had taken $1,000 out of his father's German legacy, also operated on his mind, does not appear.  It is quite certain that it was present in his mind shortly before the deed was executed, and is a strong indication of its morbid condition.

This conveyance may be considered as partly founded upon a substantial valuable consideration, and partly a gift.   In the one aspect, it is a business transaction, and requires business capacity, discretion and judgment; in the other, it may be treated as a testamentary disposition.   That most favorable for the defendants is testamentary disposition, for it is well settled that a higher degree of mental capacity is necessary to sustain a complicated business transaction than a will.

Let us see if the grantor had capacity at the time to make a will.

In this state, I cannot but think that some of the requisites of a sound and disposing mind and memory laid down by Chief-Justice Kirkpatrick in *Den* v. *Van Cleve, 2 South. 589,* have, of late, not been always attended to.   Speaking of a sound and disposing mind and memory (at *p. 660*), he says : " By these terms it has not been understood that a testator must possess these qualities of the mind, in the highest degree, otherwise very few could make testaments at all ; neither has it been understood that he must possess them in as great a degree as he may have formerly done, for even this would disable most men, in the decline of life ; the mind may have been, in some degree, debilitated, the memory may have become, in some degree, enfeebled ; and yet there may be enough left, *clearly to discern,* and *discreetly to judge,* of all those things, and all those circumstances, which enter into the nature of a rational, fair and just testament ; but if they have so far failed, as that these cannot be *discerned and judged of,* then he cannot be said to be of sound and disposing mind and memory."

Here the capacity " clearly to discern and discreetly to judge," is stated as one of the requisites ; and the quotation just made was cited with approval by Chief-Justice Ewing and Mr. Justice Drake in their opinion in *Sloane* v. *Maxwell, 2 Gr. Ch. 569.*

I stop to say that the criticism made by Chief-Justice Ewing in that opinion upon some former expressions of Chief-Justice Kirkpatrick, referred to his language in *Den* v. *Johnson, 2 South. 455;* and Mr. Justice Rossell, in his opinion in *Den* v. *Van Cleve,* in which he criticises Chief-Justice Kirkpatrick's language, refers not to the language just quoted, but to certain expressions found in his charge in that case, which is not reported; while Mr. Justice Southard, in *Den* v. *Van Cleve,* adheres to the original ruling in *Den* v. *Johnson,* and also agrees with Chief-Justice Kirkpatrick.

The same language which I have quoted from Chief-Justice Kirkpatrick was quoted with approval by Lord Chief-Justice Cockburn, in the celebrated case of *Banks* v. *Goodfellow, L. R. 5 Q. B. 549, 567.*

This definition of a sound and disposing mind and memory for testamentary purposes seems to me to be unassailable, and I am unable to believe that the learned judges of this state who have on various occasions since its promulgation expressed themselves in their own language on the point, intended to deviate from or vary it. Children under age are prohibited from making wills because they are presumed to be lacking in the very elements of capacity mentioned by Chief-Justice Kirkpatrick. In their case the statute law fixes an arbitrary period for the continuance of this incapacity. The unwritten law, for the same reason, protects the heirs and next of kin of one who has, by reason of advanced age and disease, or both, reached second childhood, from testamentary dispositions made by him while in that condition.

Now the faculty of discernment and discreet judgment includes necessarily the capacity to examine, criticise, consider, compare and weigh " all those things and all those circumstances which enter into the nature of a fair and just testament," and which ought to influence the mind of the testator in making his testamentary disposition. Unless he has this capacity for discernment and judgment, his action, however conscious of it he may be, and however it may accord with his present wishes, is the mere indulgence of a childish whim, and does not, in my opinion,

rise to the dignity of a deliberate testamentary disposition made by a person of sound and disposing mind and memory. I cannot think that mere consciousness of what he is doing is a sufficient test of testamentary capacity. The merest child may have that, and yet be far short of having a sound and disposing mind and memory. He may consciously and intentionally, and for reasons quite satisfactory to himself, give away his property, and yet no one would, for a moment, think of holding him responsible for his acts even if there were no statutory limit to his capacity. And if this be so, why should not the same protection be thrown around the next of kin and heirs of the child who is such by reason of having attained too many instead of too few years?

The evidence satisfies me that Mr. Kastell was not possessed of such a sound and disposing mind and memory at the time he made this deed, and that it was no more than the indulgence of a childish whim arising out of delusions which had no reasonable foundation in fact.

I will advise a decree accordingly.